William G. OSBORNE, Appellant,

v.

STATE of Alaska, Appellee.

No. A–8399.

Court of Appeals of Alaska.

July 6, 2007.

---

22. *See Dutch Harbor Seafoods,* 965 P.2d at 745; *Clayton,* 584 P.2d at 1113–15.

Randall S. Cavanaugh, Kalamarides & Lambert, Anchorage, for the Appellant.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and David W. Márquez, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

COATS, Chief Judge.

More than a decade ago, William G. Osborne and his friend, Dexter Jackson, were convicted of kidnapping, first-degree assault, and first-degree sexual assault stemming from an attack on an Anchorage prostitute. This Court affirmed both men's convictions on direct appeal.[1]

The current appellate litigation arises from Osborne's post-conviction request for further DNA testing of certain physical evidence in his case.

In our previous decision in this matter, *Osborne v. State*,[2] we declined to decide whether defendants in Alaska have a due process right to demand post-conviction DNA testing of physical evidence. However, we declared that, at a minimum, a defendant would have to establish three things before

---

**1.** *Jackson v. State*, Alaska App. Memorandum Opinion and Judgment No. 3330 (Feb. 7, 1996), 1996 WL 33686444 (Osborne was the co-appellant in this case.).

**2.** 110 P.3d 986 (Alaska App.2005).

claiming entitlement to post-conviction DNA testing: (1) that the defendant's conviction rested primarily on eyewitness identification; (2) that there was a demonstrable doubt concerning this identification; and (3) that scientific testing of physical evidence would likely be conclusive on the issue of whether the defendant was the perpetrator of the crime.[3]

Having established this three-part test, we remanded Osborne's case to the superior court so that the parties could litigate whether, under the facts of Osborne's case, this test was satisfied.[4] After considering this matter, Superior Court Judge Sharon L. Gleason concluded that Osborne had failed to establish any of the three factors that we set forth in *Osborne.* Accordingly, she entered an order denying Osborne's further request for DNA testing.

Osborne now appeals that decision. For the reasons explained here, we affirm Judge Gleason's ruling.

*The underlying facts of Osborne's criminal case*

In order to explain why we agree with Judge Gleason's ruling, we must recount the evidence presented at Osborne's trial in the underlying criminal case. The following account is taken from our decision denying Osborne's direct appeal, with some additional details taken from Judge Gleason's written findings.

On the night of March 22, 1993, Osborne and Jackson invited K.G. into Jackson's car, promising her that they would pay $100 for oral sex. The two men took K.G. to a secluded spot at the western end of Northern Lights Boulevard. During the ride along Northern Lights Boulevard, Osborne and Jackson asked K.G. if she was armed. When she told them that she had a Swiss army knife, the men asked if they could look at the knife. They then took the knife from her and placed it on the car's dashboard.

Jackson stopped the car at the end of Northern Lights Boulevard, and the men then asked K.G. to perform fellatio on each of them. When K.G. told Osborne and Jack-son that she would not perform without first being paid, Osborne pointed a gun at her and told her, "I think you will."

Osborne and Jackson took what little money K.G. had, made K.G. strip, and then had sex with her against her will. Osborne then ordered K.G. to get out of the car and lie face-down in the snow. When K.G. refused to leave the car and began pleading for her life, Jackson hit her in the head with the gun. Osborne then began to choke her. In fear for her life, K.G. defecated on the front passenger seat of Jackson's car. Osborne scooped up some of the excrement and rubbed it in K.G.'s face, hair, and clothing. K.G. fled from the car, but the two men took a piece of wood, probably an axe handle, from the back of the car and began to strike K.G. on her head and ribs. When K.G. tried to run away, Osborne battered her knees repeatedly, yelling "Go down, bitch; go down."

Osborne and Jackson hit and kicked K.G. until she fell down. Jackson continued to hit K.G. in her pubic area with a stick even after she had fallen. At one point, Osborne allowed K.G. to stand up, but he then hit her in the head with the axe handle.

K.G. decided to pretend that she was dead; she curled up in the snow and stopped moving. She heard a gun discharge, and she felt a bullet graze her head. (K.G. believed, based on glimpses of her assailants' feet and of Osborne's sweatsuit, that it was Osborne who shot her.) After firing this shot, Osborne and Jackson buried K.G. in the snow, apparently believing that she was either dead or dying.

Even after K.G. heard Jackson's car drive away, she continued to lie under the snow for a time, to make sure that her attackers had really left. Then she got up and started walking toward town. After walking for a short while, K.G. was able to flag down a passing automobile. K.G. told the driver and the passenger what had happened to her; she described the men who had attacked her, and the car that they were driving. K.G. asked to be taken home, because she wished

3. *Id.* at 995.

4. *Id.*

to avoid the police. The driver of the car complied with her request.

At about the same time that K.G. was making her way home, witnesses saw Osborne and Jackson together. Some of these witnesses observed that there was blood on Osborne's clothing.

The next day, a neighbor of one of the occupants of the car that had taken K.G. home reported to the police what K.G. had said about this incident. When the police contacted K.G., she was initially uncooperative, but she ultimately described what had happened to her, and she turned over the clothes that she had been wearing. These clothes were soiled with feces. K.G. also underwent a physical examination, and most of her injuries were photographed.

Five days later, in the early morning of March 28, 1993, the military police on Fort Richardson stopped Jackson's car. The military police initially stopped Jackson because he had been flashing his headlights at a pickup driving in front of him. However, the police observed that Jackson's vehicle resembled composite drawings that had been circulated by the Anchorage Police Department, based on K.G.'s description of her attackers' car. When Jackson opened his glove compartment to retrieve his vehicle registration, one of the military police officers saw a gun case. This discovery led to a search of Jackson and his vehicle.

The gun case contained Jackson's .380 caliber semi-automatic pistol. And, during their search of Jackson's person, the military police found K.G.'s Swiss army knife. (This knife was uniquely marked and dented, and K.G. was able to identify it.)

The military police seized Jackson's car and turned it over to the Anchorage police, along with the items of evidence found during the searches of the car and Jackson's person. During their subsequent search of the vehicle, the Anchorage police found a bottle of perfume that K.G. had been carrying on the night of the assault. The police also detected blood in the car. When this blood was tested for DNA at the DQ alpha locus, the testing showed that the DNA in the blood sample matched K.G.'s DNA at

that same site (i.e., the DQ alpha locus). This DNA type occurs in less than 5% of white females. In addition, when the police tested the sweaters that K.G. had been wearing that night, they found fibers matching the carpeting in Jackson's vehicle, as well as a pubic hair that was later found to have the same characteristics as Osborne's pubic hair.

K.G. later identified both Osborne and Jackson in separate photographic lineups. She also identified Jackson's car.

When the police conducted a search of the scene of the assault on March 23rd (following their initial interview with K.G.), they discovered an area of disturbed and bloody snow, as well as two pairs of K.G.'s gray stretch pants, which were also bloody. The officers observed tire tracks at the scene—tracks which were later found to match the tires on Jackson's vehicle. In addition, the police found an expended round of .380 ammunition; forensic testing later showed that this round had been fired from Jackson's gun.

The police also discovered a used blue condom near the scene. A pubic hair taken from this blue condom had the same characteristics as Osborne's pubic hair. In addition, sperm found in the condom matched Osborne's DNA type at the DQ alpha locus— a DNA type that is shared by about one-sixth (between 14.7% and 16%) of the African–American population.

*Osborne's request for additional testing of the blue condom as part of his petition for post-conviction relief*

After this Court affirmed Osborne's convictions on direct appeal, Osborne filed a petition for post-conviction relief. In this petition, Osborne asserted that he had received ineffective assistance of counsel from his trial attorney, Sidney Billingslea. Osborne's primary allegation was that Billingslea acted incompetently when she decided not to seek further DNA testing of the blue condom.

As just explained, forensic testing of the sperm found in this condom revealed that the DNA strand at the DQ alpha locus matched Osborne's DNA type at the same locus. This finding tended to link Osborne to the crime, but it was not conclusive—because approxi-

mately one-sixth of the African–American population shares this same DNA type.

The DNA testing of this sperm was conducted using a method known as "polymerase chain reaction" (PCR).[5] At the time of Osborne's trial, more discriminating methods of DNA testing were available. These methods might have excluded Osborne as the source of the sperm—or, conversely, they might have identified him more conclusively as the source of the sperm. Billingslea chose not to pursue further testing.

Responding to Osborne's allegation that this decision demonstrated incompetence, Billingslea explained that she had actively explored the possibility of having the physical evidence tested using a more discerning method. Billingslea spoke with the State's DNA expert (an employee of the State Crime Lab) and asked why the State had used the less sophisticated testing method. She reviewed various materials regarding DNA testing. And she consulted an attorney who was litigating a case involving the scientific basis of DNA testing.[6]

In the end, Billingslea decided that it was better not to seek further testing. Osborne's defense was alibi—the contention that the second man who accompanied Dexter Jackson that night was someone other than Osborne. Billingslea perceived that a more discerning DNA test was a double-edged sword: the test results could either bolster Osborne's defense or undermine it. And she relied on the fact that the State's DNA evidence left substantial room for doubt—because one-sixth of the African–American population shared this same DNA type. Given these circumstances, Billingslea concluded that "Osborne was in a strategically better position without more specific DNA testing." [7]

Judge Gleason concluded that Billingslea's decision was within the range of competence expected of criminal defense attorneys, and we affirmed that ruling on appeal.[8]

However, Osborne raised an alternative argument in his petition for post-conviction relief. Osborne asserted that even if Billingslea acted competently when she chose not to seek further DNA testing of the genetic material found on the blue condom, Osborne nevertheless had the right, as a matter of due process, to pursue more discriminating DNA testing of the condom, to see if further testing might exclude him as the source of the sperm.[9]

In our prior decision, we remanded Osborne's case to the superior court for further consideration of this issue—directing the court to employ the three-part test that we described in the third paragraph of this opinion. That is, we directed the superior court to assess: (1) whether Osborne's conviction rested primarily on eyewitness identification; and, if so, (2) whether there was a demonstrable doubt concerning this identification; and, if so, (3) whether further DNA testing of the genetic material on the condom would likely be conclusive on the issue of whether Osborne was the perpetrator of the crime.[10]

### The proceedings and findings on remand

The remand proceedings primarily involved a re-examination of the evidence presented at Osborne's trial. However, Judge Gleason also considered the fact that Osborne had applied for discretionary parole in 2004 and that, in his application to the Parole Board, Osborne admitted, both in writing and orally, his participation in the attack on K.G.[11]

5. *Osborne,* 110 P.3d at 989–90.

6. *Id.* at 990.

7. *Id.* (brackets omitted).

8. *Id.* at 990–92.

9. *Id.* at 992.

10. *Id.* at 995–96.

11. In Section 1 of Osborne's written application for parole (labeled "State Your Version of the

Offense"), Osborne wrote: "While I was out with friends I made a call to my codefendant [*i.e.,* Dexter Jackson] to come pick me up from the Space Station. After he did[,] we went driving around. When we saw [K.G.] and that she was soliciting, we decided to have sex with her and then not pay her. She got in the car with us, and we all went out to Earthquake Park. Once there[,] I pulled out a gun and ordered [K.G.] to take off her clothes. After she did, me and my codefendant took turns having sex with her. After we were done[,] I ordered [K.G.] to get out of

At the conclusion of the remand proceedings, Judge Gleason issued written findings. She concluded that Osborne failed to satisfy any prong of the three-part test set forth in *Osborne*.

Judge Gleason found that K.G.'s identification of Osborne was supported both by the physical evidence in the case and by the other evidence placing Osborne in Dexter Jackson's company on the night of the kidnaping and rape. Thus, Judge Gleason concluded, Osborne's identification as one of K.G.'s assailants did *not* rest primarily on K.G.'s testimony and K.G.'s identification of Osborne was not subject to serious doubt.

Judge Gleason then considered the third part of the test—whether further DNA testing would likely be conclusive on the question of whether Osborne was one of the two assailants.

Judge Gleason noted that if she ordered retesting, there were three possible outcomes. The laboratory might report that it was no longer possible to test the genetic material on the condom (or, at least, no longer possible to run the more discriminating tests that Osborne proposed). Alternatively, further testing might conclusively establish that the genetic material found in the condom came from Osborne. And finally, further testing might show that there was little or no chance that the genetic material came from Osborne.

With respect to this third possibility, Judge Gleason concluded that even if the testing excluded Osborne as the source of the genetic material on the condom, this would not be conclusive evidence of his innocence. The judge noted that the condom was not found until over twenty-four hours after the assault. That is, it might have been coincidentally left in the vicinity by other people, before the police arrived. Moreover, Judge Gleason noted that the State had presented

"extensive other evidence which linked Mr. Osborne to these crimes."

Finally, Judge Gleason noted that Osborne had confessed to these crimes when he applied for discretionary parole in 2004. The judge pointed out that Osborne had signed a written statement acknowledging his participation in the kidnapping and sexual assault on K.G., and that Osborne's signature appeared underneath an explicit warning that he was required to "state the exact and complete truth" in his parole application.

Given all of this, Judge Gleason concluded that even if further DNA testing showed that Osborne could not have been the source of the genetic material, this would not conclusively establish Osborne's innocence.

*Judge Gleason properly considered Osborne's confessions to the Parole Board*

■ Before we reach the merits of Judge Gleason's findings on the three prongs of the test, we must first address Osborne's argument that Judge Gleason should not have considered his confession to the Parole Board that he participated in the kidnapping and rape of K.G.

Osborne contends that, as a matter of law, Judge Gleason could only consider the evidence that was presented at his trial, and not anything that happened or came to light afterwards. We disagree.

The essence of Osborne's claim in this litigation is that he is factually innocent of the crimes for which he has been convicted—and that he has a due process right to a renewed examination of the physical evidence if there is a reasonable chance that this will demonstrate his factual innocence. Certainly, Osborne would argue (and we would agree) that if new evidence had been uncovered after his trial which tended to show that Osborne was factually innocent of these crimes, it would be proper for Judge Gleason and this Court to consider this new evidence

---

the car. She refused to do so[,] and kept refusing. I attempted to physically remove her from the car, and eventually got her out. My codefendant became enraged when he discovered that [K.G.] had defecated in his car, and [he] began to assault her with a stick. I also assaulted [K.G.] by kicking and punching her. After a few seconds[,] we both stopped, partially kicked snow

on [K.G.], and then got in my codefendant[']s car and drove off[,] leaving her at the park."

Osborne signed this statement on April 8, 2004. His signature appears underneath a printed acknowledgement that it is a class A misdemeanor under AS 11.56.210 "to submit a false written or recorded statement regarding this parole application."

when deciding whether to order further DNA testing.

For instance, if Dexter Jackson had later stated (under credible circumstances) that someone other than Osborne was his accomplice in the kidnapping and rape of K.G., that would be important evidence for a court to consider when deciding whether to grant Osborne's request for further DNA testing. Similarly, if some third person had confessed (under credible circumstances) that he, and not Osborne, was Jackson's accomplice in these crimes, this also would seem to be important evidence which Osborne would be entitled to present in support of his request for further DNA testing.

Conversely, it seems clear to us that the State should be able to avail itself of new evidence which undermines Osborne's claim of factual innocence.

Here, during Osborne's 2004 application for discretionary parole, he confessed twice (once in his written application, and again during his appearance in front of the Parole Board) that he was guilty of the crimes against K.G. These confessions are obviously relevant to Osborne's claim that the physical evidence should be retested because the testing will show that he is factually innocent. Judge Gleason could properly consider Osborne's confessions when she evaluated whether to grant Osborne's request for further DNA testing.

Osborne argues that his confessions to the Parole Board should not be believed—that he lied about his participation in these crimes so that the Parole Board would look more favorably on his request for parole. But this assertion goes to the weight of the evidence, and not to the propriety of Judge Gleason's consideration of it.

(Osborne also argues that the State improperly introduced statements made by Osborne's co-defendant, Dexter Jackson, after the trial—statements in which Jackson apparently identified Osborne as his accomplice. Osborne argues that he never had the opportunity to cross-examine Jackson about these statements. But we have examined the record on remand, and we have not found anything to suggest that Jackson's chal-

lenged statements were in fact introduced during the remand proceedings. Judge Gleason does not mention any such statements in her written findings.)

*Why we uphold Judge Gleason's findings (1) that Osborne's conviction did not rest primarily on eyewitness identification, and (2) that there was no demonstrable doubt concerning the accuracy of K.G.'s identification of Osborne*

■ Under the first two prongs of the three-part test we set forth in *Osborne,* Judge Gleason was required to assess whether Osborne's conviction rested primarily on eyewitness identification evidence, and, if so, whether there was demonstrable doubt as to the accuracy of that identification. Judge Gleason answered these questions in the negative.

Judge Gleason acknowledged that some of the State's evidence against Osborne consisted of K.G.'s eyewitness testimony. The jury heard that K.G. identified Osborne as one of the perpetrators of the crimes by picking him out of a lineup before trial, and K.G. also testified at trial that she was certain that Osborne was the passenger in Jackson's car. However, Judge Gleason noted that the State also presented substantial circumstantial evidence (including many pieces of physical evidence) tending to prove that Jackson was one of K.G.'s assailants, as well as strong evidence that Osborne was in Jackson's company at the time of these crimes.

Judge Gleason acknowledged that, compared to the State's case against Jackson, "there was less evidence to place Mr. Osborne at the scene of the crime." However, the judge listed several items of evidence that linked Osborne to the crime scene: (1) Osborne had telephoned Jackson twice from the Space Station arcade prior to the crime; (2) Osborne was observed entering Jackson's vehicle shortly before the crime occurred; (3) tickets from the Space Station were found in Jackson's car; (4) witnesses saw Osborne and Jackson together shortly after the crime occurred, and some of these witnesses observed blood on Osborne's clothing; and (5) K.G. told the driver who picked her up immediately after the assault that her attackers were "two black guys with military ... hair-

cuts"—a description consistent with Osborne's physical characteristics.

Judge Gleason also acknowledged that the jury heard some evidence of problems with K.G.'s identification of Osborne. In her written findings, Judge Gleason noted that

[t]he evidence established that K.G.'s uncorrected vision was somewhere between 20/300 and 20/400, and that she was not wearing glasses on the evening of the crime. K.G. had [described] the passenger as [not having] any facial hair, while Mr. Osborne had a mustache. And K.G. had [described] the passenger as weighing 180 to 190 pounds and [as being] between 25 to 30 years old, while Mr. Osborne was 20 years old and weighed 155 pounds. Mr. Osborne also argues that eyewitness identifications are generally suspect, especially when a person of one race is asked to identify a person from another race.

Based on these facts, Judge Gleason concluded that if K.G.'s identification of Osborne "were to be considered in isolation, without consideration of all of the other evidence that the state presented . . ., there would be demonstrable doubt concerning Mr. Osborne's identification as the perpetrator." However, when Judge Gleason weighed K.G.'s identification of Osborne "in conjunction with all of the other evidence submitted by the State at [Osborne's] trial," the judge concluded that there was no demonstrable doubt concerning Osborne's identification as one of K.G.'s assailants.

Judge Gleason noted that, during the State's summation to the jury, the prosecutor specifically invited the jury to factor out K.G.'s identification of Osborne and to evaluate the other evidence independently. The prosecutor asked the jury to engage in "an exercise of caution [by assuming that] K.G. never came in here, . . . never testified." The prosecutor maintained that, even without K.G.'s identification testimony, "the evidence in this case warrant[ed] a conviction of Osborne."

We have independently reviewed the record of Osborne's trial, and we agree with Judge Gleason's conclusions: (1) that Osborne's conviction did not rest primarily on eyewitness identification evidence; and (2)

that, taking the evidence as a whole, there was no demonstrable doubt concerning the reliability of K.G.'s identification of Osborne.

*Why we uphold Judge Gleason's finding that further DNA testing would not be conclusive on the issue of Osborne's guilt or innocence*

■ Under the third prong of the three-part test we set forth in *Osborne*, Judge Gleason was required to assess whether further DNA testing of the physical evidence in this case would likely be conclusive on the issue of Osborne's guilt or innocence. Judge Gleason concluded that further DNA testing would not yield a conclusive answer.

As we explained above, Judge Gleason perceived that further DNA testing could yield three possible outcomes. First, the laboratory might find that it was no longer possible to test the genetic material on the condom (or, at least, no longer possible to run the more discriminating tests that Osborne proposed). Second, further DNA testing might conclusively establish that the genetic material found in the condom came from Osborne. And third, further testing might show that there was little or no chance that the genetic material came from Osborne.

The question confronting Judge Gleason was this: assuming that this third alternative came to pass—*i.e.*, assuming that a more discriminating DNA test showed that the genetic material did not come from Osborne—would this test result be conclusive evidence of Osborne's innocence? Based on her examination of all the evidence in Osborne's case, Judge Gleason concluded that the answer was "no."

First, Judge Gleason noted that the condom was not firmly linked to the assault on K.G. The condom was not found until over twenty-four hours after the assault. Accordingly, it might have been coincidentally left in the vicinity by another person before the police arrived.

Second, Judge Gleason noted that the State presented extensive other evidence linking Osborne to the kidnapping and rape—primarily, the physical evidence that firmly tied Jackson to these crimes, the phys-

ical evidence that placed Osborne in Jackson's vehicle (the Space Station tickets), and the testimony of several witnesses who saw Osborne in Jackson's company both before and after the assault.

Finally, Judge Gleason noted that Osborne had confessed to these crimes when he applied for discretionary parole in 2004. The judge pointed out that Osborne had submitted a written statement to the Parole Board in which he acknowledged his participation in the kidnapping and sexual assault on K.G. In this written statement, Osborne described these crimes in some detail. Moreover, Osborne's signature on this statement appears underneath an explicit warning that he was required to "state the exact and complete truth" in his parole application, and that any lies in his statement would subject him to prosecution for unsworn falsification under AS 11.56.210.

Given all of this, Judge Gleason concluded that even if further DNA testing showed that Osborne could not have been the source of the genetic material, this would not conclusively establish Osborne's innocence. We agree.

We note that the Washington Court of Appeals in *Riofta v. State*,[12] recently confronted a similar case and reached the same conclusion—that the defendant was not entitled to post-conviction DNA testing of physical evidence.

The defendant in *Riofta* was convicted of first-degree assault with a firearm. The victim of the assault described the shooter as wearing a white hat during the assault.[13] The police later identified the owner of this white hat, but they discovered that the hat had been stolen, along with the owner's car, prior to the assault. Riofta had apparently emerged from this stolen car immediately before assaulting the victim.[14]

After Riofta was convicted, he commenced litigation under the authority of a Washington statute which provides for post-conviction DNA testing in criminal cases. Riofta asked the court to order DNA testing of the hat—arguing that if his DNA did not show up on the hat, this would establish his innocence.[15] The Washington appeals court, however, concluded that "DNA testing [might] show only who wore the hat after the car was stolen. DNA testing [would] not resolve who wore the hat during the shooting." [16]

In addition to bringing suit under the Washington statute, Riofta also argued that he had a due process right to have the hat tested for DNA.[17] In making this argument, Riofta explicitly relied on this Court's decision in *Osborne*.

The Washington court noted that the courts of that state "have not adopted a version of the three-part *Osborne* test." [18] But the court also observed that the Washington Supreme Court in *In re Personal Restraint of Gentry*[19] had favorably referred to a similar three-part test.[20]

Nevertheless, the *Riofta* court concluded that, under the facts of the case, Riofta could not satisfy "the critical requirement of demonstrating that DNA testing of the white hat would conclusively, or even likely, prove his innocence." [21] The court explained:

The absence of Riofta's DNA on the white hat [would] not necessarily indicate that Riofta was not the shooter[,] because Riofta may not have transferred his DNA to the hat. For example, evidence indicates that the shooter could have worn the hat for only a relatively short period of time because the car in which the hat was located was stolen within twelve hours of the

---

12. 134 Wash.App. 669, 142 P.3d 193 (2006).

13. *Id.* at 196.

14. *Id.*

15. *Id.* at 198.

16. *Id.* at 201.

17. *Id.*

18. *Id.* at 203.

19. 137 Wash.2d 378, 972 P.2d 1250 (1999).

20. *Riofta,* 142 P.3d at 203–04 (quoting *Gentry,* 972 P.2d at 1258); *see also Osborne,* 110 P.3d at 995 n. 27 (citing *Gentry* ).

21. *Riofta,* 142 P.3d at 204.

shooting. Moreover, the presence of someone else's DNA (other than the hat's owner ...) [would] not exonerate Riofta[,] because Riofta and other persons could have worn the hat without all of them transferring DNA [to the hat.] ... [E]ven if DNA on the white hat matched [someone else], it [would] not conclusively establish Riofta's innocence[,] given the number of persons [the victim] saw in the car who may have worn the hat.[22]

The facts of *Riofta* are similar to the facts presented in Osborne's case, and we reach a similar conclusion. As Judge Gleason found, Osborne simply has not shown that further DNA testing would establish his innocence, even if the results of this testing excluded him as the source of the genetic material.

### Conclusion

For the reasons explained here, we agree with Judge Gleason that Osborne failed to satisfy any portion of the three-part test that we set out in our previous decision. We accordingly conclude that Osborne has failed to show that he is entitled to further DNA testing of the physical evidence in this case.

This was the only issue left unresolved from Osborne's application for post-conviction relief. Accordingly, the judgment of the superior court (denying Osborne's application) is AFFIRMED.

MANNHEIMER, Judge, joined by Coats, Chief Judge, concurring.

This case raises the question of whether an Alaska court has the authority, in the absence of a pertinent statute, to order post-conviction DNA testing of physical evidence—and if so, under what circumstances a court should exercise that authority. The resolution of this question requires us to balance two competing principles of the criminal justice system. Our task is hard because both principles are crucially important to the fair administration of criminal justice.

The first principle is that, after we are assured that a defendant has received a trial conducted in accordance with the procedural requirements of our constitution, our stat-

utes, and our court rules, society has a justifiable interest in prohibiting the defendant from seeking to re-open the litigation.

All of these procedural protections—at trial, on appeal, and in post-conviction relief litigation—are designed to ensure, to the extent humanly possible, that only the truly guilty are punished. To be sure, it is seldom possible to attain absolute certainty when we try to reconstruct and analyze human affairs. But after a defendant has received the benefit of all required procedural protections, society can justifiably insist that the defendant's conviction not be subjected to further attack.

As this Court explained in *Grinols v. State,*

> Society has a substantial interest in making sure that criminal litigation eventually reaches an end. All persons involved in the litigation—defendants, victims, families and friends, investigative agencies, as well as the public at large—have a right to expect that criminal cases will be finally resolved at some point. If prisoners are allowed to assert claims long after their trials, society runs the risk that re-trials may be ordered years after the event, when witnesses may no longer be available or their memories of the pertinent occurrences have been lost or diminished. In addition, piecemeal litigation of successive and often fruitless post-conviction claims poses a significant cost to the courts and the other components of the criminal justice system.

*Grinols,* 10 P.3d 600, 605–06 (Alaska App. 2000). Moreover, as our supreme court recognized in *Merrill v. State,*

> finality may be a crucial element [in the] effectiveness [of the criminal law]. A procedural system which permits an endless repetition of inquiry into facts and law in a vain search for ultimate certitude implies a lack of confidence about the possibilities of [administering] justice that cannot but war with the effectiveness of the [law's] underlying substantive commands. Furthermore, ... an endless reopening of convictions, with its continuing underlying implication that perhaps the defendant can

22. *Id.*

escape from corrective sanctions after all, [is potentially inconsistent] with the aim of rehabilitating offenders.

*Merrill*, 457 P.2d 231, 236 (Alaska 1969).

In the present case, William Osborne was tried and convicted of sexual assault and his conviction was affirmed by this Court on appeal.[1] He then litigated and lost a claim of ineffective assistance of counsel in the superior court, and this Court affirmed the superior court's resolution of the ineffective assistance claim.[2] At this point, society has a weighty interest in insulating the jury's verdict from further attack.

Nevertheless, our criminal justice system is also founded on a second principle: that innocent people should not be punished. In theory, this second principle should not normally conflict with the first principle described above. But police investigations and jury trials are conducted by human beings.

There are times when evidence of the defendant's guilt is fabricated, or evidence of the defendant's innocence is willfully suppressed. We trust that these occasions are few. But even the most scrupulous and honest police officers, witnesses, and victims sometimes work from limited knowledge, or are hampered by preconceived notions, or are simply mistaken. And jurors must make their decision based on the evidence presented in court. In short, our justice system is run by human beings who ultimately are fallible.

Despite our society's best efforts, and despite total compliance with the procedural protections specified by law, innocent people are in fact convicted. This Court noted several instances of this in footnote 52 of our *Grinols* opinion (10 P.3d at 616). And earlier this spring, the Anchorage Daily News carried an account of yet another man who was freed after serving years in prison for a rape he did not commit. The victim initially identified the man as her attacker. But after being confronted with genetic evidence and other circumstantial evidence indicating that the wrong man had been identified, the victim acknowledged that she was no longer certain of her identification.[3] Because of this risk that we have punished the innocent, even when a defendant has been found guilty after a fair trial, the law must make some provision for re-examining a criminal conviction if it appears that the verdict is mistaken. Alaska law currently contains two such provisions.

Under Alaska Criminal Rule 33(c), a defendant may file a motion for a new trial based on newly discovered evidence within 180 days of the final judgement. To obtain relief under Criminal Rule 33, the defendant must make a threshold showing that the evidence is truly newly discovered, and that diligent effort would not have revealed this evidence any sooner.[4] Assuming these two requirements are met, the defendant must then convince the court that the evidence is not merely cumulative or impeaching, and that the evidence is so significant that it would probably lead to a different verdict if the defendant's case were re-tried.

Even if a defendant misses the 180–day time limit specified in Criminal Rule 33(c), the defendant can seek post-conviction relief under AS 12.72.010(a)(4) on the basis that new evidence "requires vacation of the [defendant's] conviction ... in the interest of justice". Normally, a petition for post-conviction relief must be filed within two years of the final judgement (or within one year after that judgement is affirmed on appeal).[5] However, AS 12.72.020(b)(2)(D) declares that, "[n]otwithstanding [this time limitation], a court may hear a claim [for post-conviction relief] based on newly discovered evidence if the applicant establishes due diligence in presenting the claim and [the new evidence]

---

1. *Jackson and Osborne v. State*, Alaska App. Memorandum Opinion No. 3330 (February 7, 1996), 1996 WL 3368644.

2. *Osborne v. State*, 110 P.3d 986 (Alaska App. 2005).

3. "Judge clears man in prison for 1982 rape", Anchorage Daily News, April 10, 2007, page A–3.

4. *See Dorman v. State*, 622 P.2d 448, 455–56 (Alaska 1981), quoting *Salinas v. State*, 373 P.2d 512, 514 (Alaska 1962).

5. AS 12.72.020(a)(3)(A).

establishes by clear and convincing evidence that the applicant is innocent."

The problem facing Osborne in the present case is that the DNA testing he proposes would not yield "new evidence" for purposes of either Criminal Rule 33 or AS 12.72.010(a). Under both of these provisions, a defendant must show that the evidence was not available sooner, despite diligent efforts to uncover it. But as we explained in our earlier opinion, *Osborne v. State*, 110 P.3d at 989–990, a DNA analysis of the physical evidence was conducted by the State crime laboratory in advance of Osborne's trial, and the results of this testing were available to Osborne and his attorney. It is true that Osborne now proposes a different, more discriminating DNA test—but this more discriminating DNA was also available at the time of Osborne's trial. Osborne's attorney actively debated whether to pursue this more discriminating test, but she ultimately decided not to—because the State's DNA testing was not extremely probative (roughly fifteen to sixteen percent of the relevant population had matching DNA), and because the results of a more discriminating test might have been much more incriminating to Osborne. *Id.* at 990.

(We concluded that, under these circumstances, Osborne's attorney acted competently when she chose not to pursue the more discriminating test. *Id.* at 992.)

Given these facts, it would seem that equity does not favor Osborne. Osborne's attorney could have asked for the more discriminating DNA test, but she understood the risk of performing this test, and she consciously chose to go forward without this evidence. Now, years later, Osborne asserts that the more discriminating DNA test must be run, and that his guilt must be re-evaluated.

As our supreme court explained in *Owens v. State*, 613 P.2d 259, 261 (Alaska 1980), a defendant should not be allowed to "take a gambler's risk and complain only if the cards [fall] the wrong way". See *Riofta v. State*, 134 Wash.App. 669, 142 P.3d 193 (2006), where the Washington Court of Appeals discussed a similar case:

> [T]here is nothing "new" about the [physical evidence] or any information that [DNA testing] may [yield]. DNA testing of comparable accuracy was available at trial. Because [the defendant] chose not to test the [physical evidence] at trial does not mean that any information discoverable through post-conviction testing is now "new."
>
> . . .
>
> [A] strained consequence results if we were to [adopt] the hyper-literal interpretation [of "new evidence" that the defendant] urges[.] [This interpretation would] allow[ ] a defendant to take a "wait and see" position on DNA testing by trying to gain [an] acquittal without the DNA information but, following conviction, moving to test the DNA.
>
> . . .
>
> Accordingly, we hold that ... [i]f a person requests [post-trial] DNA testing of evidence [and] the same or comparable testing [was available at trial, any] information that the [post-trial] testing might reveal ... is not "new".....

*Riofta v. State*, 142 P.3d at 200.

It therefore appears that, under the applicable Alaska statutes and court rules, Osborne would not be entitled to relief even if renewed DNA testing conclusively established his innocence.

And yet, if we are indeed committed to the principle that we should not punish people who are demonstrably innocent, it would seem that our criminal justice system should have a fail-safe mechanism for reviewing criminal convictions even in situations like Osborne's—that is, even when a defendant has knowingly chosen to go to trial without seeking to uncover the evidence that the defendant now asserts will demonstrate their innocence.

If Osborne could show that he were in fact innocent, it would be unconscionable to punish him, even if that punishment would ostensibly comport with all of our law's procedural requirements. As this Court suggested in *Grinols*, 10 P.3d at 617, the due process clause of the Alaska Constitution might require us to intervene in cases where a defendant presents clear genetic evidence of their

innocence, even if the rules governing motions for new trial and petitions for post-conviction relief would bar the defendant from obtaining any relief.

Here, Osborne has not offered any genetic evidence. Rather, he asks this Court to order re-testing of the condom found at the scene of the crime so that he can obtain new genetic evidence that might conceivably favor his claim of innocence.

In our prior opinion in Osborne's case, we assumed that this Court would be obliged to order the proposed DNA testing if Osborne could show that a favorable test result would conclusively establish his innocence. *Osborne,* 110 P.3d at 995. We then remanded Osborne's case to the superior court, directing the superior court to decide whether, under the facts of Osborne's case, he could meet this requirement for renewed DNA testing. *Id.*

As explained in the lead opinion, Judge Gleason concluded that even if renewed DNA testing yielded the result most favorable to Osborne—that is, even if the renewed testing showed that Osborne could not be the source of the genetic material found on the condom—this test result would not conclusively establish Osborne's innocence.

Given the evidence in Osborne's case (both the evidence presented at Osborne's trial and the additional fact that Osborne has since confessed his guilt), Judge Gleason correctly concluded that, no matter what results the proposed DNA testing might yield, this renewed testing could not conclusively establish Osborne's innocence. Thus, even if the due process clause would require additional or renewed DNA testing in some instances, re-testing is not required in Osborne's case.

For these reasons, I agree with my colleagues that the decision of the superior court should be affirmed.