Christopher LINDEMAN,
Appellant/Cross–
Appellee,

v.

STATE of Alaska, Appellee/Cross–
Appellant.

Nos. A–10254, A–10283.

Court of Appeals of Alaska.

Jan. 7, 2011.

Colleen A. Libbey, Libbey Law Offices, LLC, Anchorage, for the Appellant.

Diane L. Wendlandt, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

BOLGER, Judge.

Both parties appeal from rulings on Christopher Lindeman's application for post-conviction relief from his conviction for second-degree murder. The State argues that Superior Court Judge Patrick J. McKay failed to make sufficient findings to justify the conclusion that Lindeman received ineffective assistance from the attorney who handled the appeal from Lindeman's conviction. We conclude that the court made sufficient findings on this issue, and that there is a reasonable possibility that Lindeman would have prevailed on appeal if he had attacked the jury instruction on his duty to protect the victim.

Lindeman argues that his trial attorney was ineffective for his delay in obtaining DNA testing, for his incomplete response to the State's request for this jury instruction, for his failure to employ a neuropathologist, and for his conduct at the sentencing hearing. Lindeman also argues that new results from DNA testing and evidence of juror misconduct require a new trial. We agree with Judge McKay's conclusion that Lindeman failed to raise material issues requiring a hearing on these claims.

### Background

Lindeman was found calling for help in an internal stairwell outside his apartment; his

roommate, Amos Gordon Rossman, was found beaten and dead in the bathroom. Lindeman gave two statements in which he claimed innocence and alleged that he and Rossman had been on an extended drinking binge and were beaten by skinheads on the way back to Lindeman's apartment. The coroner determined that Rossman's blood alcohol level was .442%.

The trial jury convicted Lindeman of second-degree murder. Lindeman appealed his conviction and this court affirmed.[1] In January 2002, Lindeman filed a pro se application for post-conviction relief, which was amended after he secured counsel.

In March 2007, Judge McKay granted the State's motion to dismiss the application. But the judge later granted Lindeman's motion for reconsideration of his claim regarding ineffective assistance of appellate counsel. After conducting a hearing on the claim, Judge McKay ruled that appellate counsel was ineffective and granted Lindeman a new merit appeal.

■ Lindeman appeals from Judge McKay's order granting the State's motion to dismiss Lindeman's remaining claims. The judge relied on considerable material outside the application for post-conviction relief when he granted the State's motion, so we will review his ruling as an order granting summary judgment.[2] A court may grant summary judgment on an application for post-conviction relief if "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."[3] We review this type of order de novo, viewing the evidence and all reasonable inferences in the light most favorable to the nonmoving party.[4]

■ The State cross-appeals Judge McKay's order granting Lindeman's application on the issue of ineffective assistance of appellate counsel. On this issue, we accept the trial court's findings of fact unless they are clearly erroneous, and we review the trial court's conclusions of law de novo.[5]

### The DNA Evidence

#### Performance of trial counsel

■ Lindeman argues that his trial counsel was ineffective for failing to obtain DNA testing of the blood evidence from the crime scene. The trial attorney did obtain favorable test results of a towel and a t-shirt just prior to trial and a favorable test result of the alleged murder weapon during trial. According to Lindeman, however, these efforts were untimely.

The State's case was largely based on blood found throughout Lindeman's apartment. Rossman was found dead in Lindeman's bathroom in a pool of blood. Blood stains were found throughout the apartment and on the alleged murder weapon, a seventeen-pound dumbbell. Blood was also found on Lindeman's t-shirt and a towel, which were in a washing machine. There were cast-off stains on the ceiling. The State argued that this evidence suggested that Lindeman struck Rossman with the dumbbell in the living room and then dragged him to the bathroom to make it look like he fell and struck his head.

Lindeman maintained his innocence throughout the investigation and trial. In two statements given to police, he alleged that he and Rossman had been beaten by skinheads on their way back to Lindeman's apartment. Lindeman alleged that he had

1. *Lindeman v. State*, Mem. Op. & J. No. 4356, 2001 WL 219747, at *1, *6 (Alaska App. Mar. 7, 2001).

2. *See Phillips v. Gieringer*, 108 P.3d 889, 892–93 (Alaska 2005) (holding under the similar provisions of Alaska Civil Rule 12(b) that if the court does not exclude materials outside of the pleadings when deciding a motion to dismiss, the motion is treated as a motion for summary judgment).

3. Alaska R.Crim. P. 35.1(f)(3).

4. *Beilgard v. State*, 896 P.2d 230, 233 (Alaska 1995).

5. *See Tucker v. State*, 892 P.2d 832, 834 (Alaska App.1995).

suffered a nosebleed in the fight. He also said that Rossman had been sitting in the recliner, but that he then assisted him to the bathroom. He later heard Rossman fall and found him lying on the floor. Lindeman stated that he (Lindeman) was blacking out after they returned to his apartment.

Lindeman's trial attorney received discovery information indicating that a detective put in a lab request for DNA testing of the evidence in October 1997. In June 1998, the trial attorney wrote to the State to inquire about the testing, but received no reply. On July 17, the prosecutor notified Lindeman's trial attorney that the State was not going to conduct blood testing. The trial attorney then decided to test some of the items most likely to contain Lindeman's blood. A few days before trial, the trial attorney received results indicating that Lindeman's own blood was on his t-shirt and a towel found in the apartment. The trial attorney then made a motion for a continuance so that he could test the dumbbell and several other items he felt should have been tested.

At the hearing on the motion for a continuance, the trial attorney argued that he would not be able to provide effective assistance if he proceeded to trial without the DNA evidence. The trial court denied his motion. But the attorney did secure and present DNA testing showing that the blood on the dumbbell was Lindeman's blood.

In his application for post-conviction relief, Lindeman argued that the trial attorney had been ineffective for failing to obtain the DNA evidence. According to Lindeman, his trial attorney failed to seek testing in a timely matter: he did not follow up on the tests ordered in October 1997 until June 1998, did not receive an answer until July 1998, and then waited an additional month before seeking testing.

In his affidavit, Lindeman's trial attorney explained that, through discovery, he re-ceived a police request for the blood testing, and that he "certainly wanted to know how the blood testing came out before trial." When prompted by a retained crime scene technician, he asked the State about the results. And when the State informed him that it would not be conducting the tests, he was left with a tactical choice: do nothing and argue the deficiency of the State's case, or do the testing. After mulling it over, he decided to approach the matter conservatively and test the two items most likely to contain Lindeman's blood. When those results confirmed that Lindeman had been an active source of bleeding, he made the motion for a continuance to test the dumbbell and other items. The trial attorney concluded that he had been ineffective for his failure to order a more timely and comprehensive DNA identification of the blood samples.

■■■ "When a defendant claims that he has been prejudiced by ineffective assistance of counsel, the defendant must show that his counsel did not perform 'as well as a lawyer with ordinary training and skill in … criminal law.'"[6] We apply "a strong presumption of competence" and a "presumption that trial counsel's actions were motivated by sound tactical considerations."[7]

■■■ "In the absence of evidence ruling out the possibility of a tactical reason to explain counsel's conduct, the presumption of competence remains unrebutted and operates to preclude a finding of ineffective assistance."[8] That is, "[i]f the record does not adequately reveal the basis for the attorney's decision, then the accused has failed to establish a case for post-conviction relief."[9]

In his order dismissing Lindeman's post-conviction relief petition, Judge McKay concluded that the trial attorney's decisions were tactical. He explained that although the State's delay may have inconvenienced Lindeman, there was no evidence that the

---

**6.** *Smith v. State*, 185 P.3d 767, 768 (Alaska App. 2008) (quoting *State v. Jones*, 759 P.2d 558, 567 (Alaska App.1988)).

**7.** *Jones*, 759 P.2d at 569.

**8.** *Id.*

**9.** *Smith*, 185 P.3d at 768.

trial attorney acted incompetently: the trial attorney acted once his theory was formed and his decision to wait until that juncture to seek further testing was a reasonable tactical decision. According to Judge McKay, the trial attorney's actions were "within the range of reasonable actions which might have been taken by an attorney skilled in criminal law." [10]

We reviewed a similar tactical decision in *Osborne v. State (Osborne I )*.[11] In *Osborne,* the State used DNA testing on a condom at the scene of a rape.[12] The State's testing was imprecise, showing only that approximately sixteen percent of the African–American population matched the DNA from this sample.[13] The defense attorney chose not to seek more precise testing in order to avoid a test result that could confirm her client's guilt.[14] We held that the defense attorney made a legitimate tactical decision to avoid a more precise DNA test.[15]

Here, the only contested issue is whether the trial attorney's delay in obtaining DNA testing was tactical. The trial court found the decision was tactical because the trial attorney initially waited until he could review the results of the State's testing. Once the State informed the trial attorney it was not going to test the blood, he made the tactical decision to test the two items most likely to contain Lindeman's blood. Then after the trial attorney received results showing Lindeman's blood on these two items, he made another tactical decision to test the alleged murder weapon. We conclude that Lindeman failed to raise any material issues suggesting that the trial attorney's decisions regarding the DNA testing were ineffective.

*Newly discovered evidence claim*

Lindeman also argues that he is entitled to a new trial under Criminal Rule 35.1 because of new evidence in the form of additional DNA tests performed after his trial. An applicant who seeks post-conviction relief based on newly discovered evidence must meet the same burden as a defendant who brings a motion for a new trial on the same ground.[16] The applicant must show that the proposed new evidence is newly discovered and would probably produce an acquittal.[17]

Lindeman alleges that he has new DNA tests of blood from the crime scene indicating that Lindeman's blood was found throughout the apartment, which refutes the State's theory that it was all Rossman's blood. But these DNA tests are not "new evidence" because they were based on evidence available at trial.[18] Lindeman is not entitled to a new trial because the evidence is not "new evidence" that would entitle Lindeman to post-conviction relief.

*Request for additional testing*

Lindeman also argues that he is entitled to additional DNA testing. On appeal, Lindeman does not identify what additional tests he wishes performed, but in his post-conviction relief application he requested supplemental testing of certain ceiling stains, floor stains, and various objects at the crime scene. Lindeman argues that the testing should be granted under this court's opinion in *Osborne I.*

In *Osborne I,* we adopted a three-part test to determine whether a court should order

---

10. *See generally Risher v. State,* 523 P.2d 421, 425 (Alaska 1974) (holding that, if a defendant proves that their attorney failed to act with the minimum level of competence expected of criminal law practitioners, the defendant is entitled to relief if the defendant can additionally demonstrate "a reasonable doubt that the [attorney's] incompetence contributed to the outcome").

11. 110 P.3d 986 (Alaska App.2005).

12. *Id.* at 989.

13. *Id.*

14. *Id.* at 991–92.

15. *Id.* at 992.

16. *Lewis v. State,* 901 P.2d 448, 449–50 (Alaska App.1995).

17. *Id.* at 450.

18. *Osborne v. State (Osborne II ),* 163 P.3d 973, 984 (Alaska App.2007).

additional DNA testing: "(1) that the conviction rested primarily on eyewitness identification evidence, (2) that there was a demonstrable doubt concerning the defendant's identification as the perpetrator, and (3) that scientific testing would likely be conclusive on this issue." [19]

The first requirement for additional testing under *Osborne I* is that the conviction rested primarily on eyewitness identification.[20] Lindeman recognizes that eyewitness identification is not at issue in his case, but he argues that he should be granted additional testing because the case against him was based entirely on circumstantial evidence. However, Lindeman provides no support for his argument that the rule should be expanded to include convictions other than those based on eyewitness testimony.

The second requirement is that there was a demonstrable doubt about the defendant's identification as the perpetrator.[21] Although Lindeman argued that both he and Rossman were attacked by skinheads on their way home, his case does not satisfy this requirement. There is no contention that there were any other individuals in the apartment other than Rossman and Lindeman. The only question about the DNA evidence in the apartment is whether the various blood stains in the apartment belonged to Rossman or Lindeman. Lindeman does not argue that DNA testing would identify some other perpetrator.

The third requirement is that the additional testing must conclusively establish whether the defendant was the perpetrator.[22] Although favorable test results may significantly buttress Lindeman's case, they would not be conclusive. Even assuming that testing all of the blood stains yielded only Lindeman's DNA, there would remain substantial circumstantial evidence of Lindeman's guilt.

Lindeman's request for additional DNA testing fails on all three prongs of the *Osborne I* test.

### The Special Duty Jury Instruction

At grand jury, the State relied on the theory that Lindeman killed Rossman by bludgeoning him with a dumbbell. However, well into trial, Lindeman received and presented DNA test results indicating that the blood on the dumbbell was Lindeman's and not Rossman's.

During deliberations, the jury asked the trial court if it could "consider the possibility that other objects observed in the photographic evidence could have been used as assault weapons." The trial court answered in the affirmative. Six days later, the jury reported that it was "unable to reach a unanimous decision on the charge[s] of murder in the first degree [and] ... tampering with physical evidence." The court summoned the jury, discussed the problem, and then sent the jurors back to clarify their status. The jury then sent a note requesting the "procedure for considering lesser charges," and the judge reread the appropriate instruction.

Later the jury asked, "Does the phrase 'knowingly engaged in conduct' in ... instruction # 17 include failing to take action?" Instruction 17 provided the elements for second-degree extreme-indifference murder.[23] The judge then gave the jury Supplemental Instruction # 1:

"Conduct" means an act or omission and its accompanying mental state.

For purposes of "knowingly engaging in conduct under circumstances manifesting extreme indifference to the value of human life" the law requires that a criminal defendant knowingly perform an act and that the defendant be reckless as to the sur-

**19.** 110 P.3d at 995.

**20.** *Id.*

**21.** *Id.*

**22.** *Id.*

**23.** *See* AS 11.41.110(a)(2).

rounding circumstances ("under circumstances manifesting extreme indifference to the value of human life") and the result (the death of another). The definitions of knowingly and recklessly are contained in [your] prior instructions.

In general, the law imposes no affirmative duty on a defendant to protect a victim from danger. Thus, the failure to take action generally cannot give rise to criminal liability. However, if a defendant performs an act or acts that endanger a person or create a situation of danger to another person, you may consider a defendant's "failure to take action" to prevent harm to the victim in determining whether the defendant's conduct gives rise to criminal liability.

The jury then acquitted Lindeman of first-degree murder and convicted him of second-degree murder.

### Performance of trial counsel

■ Lindeman argues that his trial attorney was ineffective for failing to raise additional objections to this supplemental jury instruction. However, Lindeman did not advance the theory that his trial attorney was ineffective for this reason until his motion for reconsideration of the dismissal of the application. Ordinarily, a court has "no obligation to consider an issue raised for the first time in a motion for reconsideration." [24]

Moreover, Lindeman's pleadings in the trial court are inconsistent with this claim. He initially praised his trial attorney's objections to the instruction and his efforts to contain the resulting prejudice. And when he responded to the State's motion to dismiss, Lindeman did not note the existence of this claim. Lindeman did not present a prima facie case of ineffectiveness on this issue because it was not presented to the trial court in a timely manner.

### Performance of appellate counsel

■ In his amended application for post-conviction relief, Lindeman alleged that his appellate counsel was ineffective for failing to argue that the supplemental instruction was erroneous. Following a hearing on that claim, Judge McKay concluded that appellate counsel had been ineffective. In its cross-appeal, the State argues that Judge McKay's findings did not support his grant of post-conviction relief and that an appeal of the instruction would not have been successful.

■ In order "[t]o establish a prima facie case that an appellate counsel's choice of issues was incompetent, the defendant must establish (1) that the proposed additional issue is significantly stronger than the issues that were raised in the appeal; (2) that the appellate attorney had no valid tactical reason for failing to include this particular issue; and (3) that, if the proposed issue had been included, there is a reasonable possibility that the outcome of the appeal would have been different." [25] On appeal, the State challenges the third factor, specifically arguing that Judge McKay failed to make a sufficient finding that there was a reasonable possibility that the appeal would have been successful had appellate counsel challenged this instruction.

But Judge McKay's written order stated that "there is a reasonable possibility that the outcome of the appeal would [have been] different" if Lindeman's attorney had raised this issue on appeal. The judge also found that "[t]here is a reasonable argument that the timing of the instruction created a fatal variance [from] the grand jury indictment," and that "[e]ven if viewed as a 'mere variance' [from] the grand jury indictment, it is arguable that the supplemental instruction sufficiently prejudiced [Lindeman] such that it constitutes reversible error." We conclude that Judge McKay did make sufficiently clear

---

**24.** *J.L.P. v. V.L.A.,* 30 P.3d 590, 597 n. 28 (Alaska 2001); *see also DeNardo v. GCI Commc'n Corp.,* 983 P.2d 1288, 1290 (Alaska 1999) ("Issues raised for the first time in a motion for reconsideration are untimely.").

**25.** *Coffman v. State,* 172 P.3d 804, 813 (Alaska App.2007).

findings that there was a reasonable possibility that the argument on this supplemental instruction would have succeeded if it was raised on appeal.

■ We also conclude that Judge McKay's conclusions regarding this issue were correct. There is a reasonably promising argument that the supplemental jury instruction constituted a constructive amendment of Lindeman's murder charge. A constructive amendment occurs when the defendant is convicted of a charge based on evidence that is materially different than the evidence that supported the grand jury indictment.[26]

In *Michael v. State*, the defendant was charged with assault in the first degree under an extreme indifference theory: the indictment alleged that Michael had caused serious physical injury to his daughter under circumstances manifesting extreme indifference to the value of human life, by fracturing her bones.[27] But the trial judge found Michael guilty under the theory that Michael had, through inaction, violated his special duty as a parent to take affirmative action to protect his child from assaults committed by his wife.[28] The supreme court held that this constituted a fatal amendment from the original indictment, requiring Michael's conviction to be reversed.[29]

In this case, Lindeman was charged with first-degree murder in an indictment alleging that Lindeman assaulted Rossman intending to cause his death. The trial jury was instructed that they could find Lindeman guilty of the lesser included offense of second-degree murder on an extreme indifference theory if the State proved that Lindeman caused Rossman's death under circumstances manifesting extreme indifference to the value of human life.

The supplemental instruction explaining the second-degree murder charge made a change in this extreme-indifference charge that was similar to the change that supported the verdict in the *Michael* case. The supplemental instruction told the jury that they could find Lindeman guilty under a theory that through inaction he violated a special duty owed to Rossman—the duty requiring a person who places another person in danger to take affirmative action to protect the other person from harm.[30] Lindeman has a reasonable argument that this variance was the same type of fatal variance that required a reversal in *Michael*.

We also agree with Judge McKay that there is a reasonable argument that the timing of the supplemental instruction caused Lindeman unfair prejudice. Lindeman was entitled to make his arguments to the jury based on the intentional first-degree murder charge that the State had pursued during the trial and the lesser charges that were necessarily included.[31] There is a reasonable argument that it was unfairly prejudicial to give the jury an instruction on a new theory of the case during deliberations, after Lindeman had lost the opportunity to present any evidence or arguments on that theory.[32] In other words, Lindeman had another argument with a reasonable possibility of success: the argument that he was unfairly prejudiced by the supplemental instruction because he

26. *See Michael v. State (Michael II)*, 805 P.2d 371, 373 (Alaska 1991) (quoting 2 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 19.2(h), at 469–70 (1984)).

27. *Id.* at 372.

28. *Michael v. State (Michael I)*, 767 P.2d 193, 196–97 (Alaska App.1988), *rev'd*, 805 P.2d 371 (Alaska 1991).

29. *Michael II*, 805 P.2d at 374.

30. *See* 1 Wayne R. LaFave, *Substantive Criminal Law* § 6.2(a)(5), at 441–42 (2d ed. 2003).

31. *See generally Rollins v. State*, 757 P.2d 601, 602–03 (Alaska App.1988) (indicating the defendant was entitled to "make his jury argument on the assumption that the lesser-included offense would not be submitted to the jury").

32. *See generally Bowers v. State*, 2 P.3d 1215, 1219–21 (Alaska 2000) (concluding the decision to give the jury an instruction on a new theory of the case during deliberations "created a strong likelihood of prejudice").

did not have a fair opportunity to argue against the charge that he failed to render aid.

We agree with Judge McKay's decision that Lindeman is entitled to reopen the appeal from his conviction based on the ineffective assistance of his appellate counsel.

### Other Issues

#### Juror misconduct

 Lindeman also argues that he is entitled to a new trial because of juror misconduct. Lindeman argues that juror Evan Phillips failed to disclose his relationship to an individual on the witness list and that his failure to disclose the relationship prejudiced his case. The State responds that the trial court correctly rejected the argument because Lindeman failed to show that he would have challenged the juror had the juror disclosed the relationship, the alleged misconduct did not involve material matters, and Lindeman did not establish prejudice.

At the start of voir dire, Judge Card had the assistant district attorney read the names of the anticipated witnesses to the jury. Scott Weeks's name was read from the list. Judge Card asked the prospective jurors if they were related to or knew any of the parties or witnesses involved in the case, and Phillips did not respond that he knew Weeks. On individual voir dire, Phillips did disclose that he was a recovering alcoholic, but he was not questioned about his involvement in recovery programs.

Lindeman's claim is based on information he obtained after the trial. Lindeman submitted an affidavit of Galen Huntsman, an acquaintance of Lindeman's, in which Huntsman stated that he was present in court for one day during Lindeman's trial and that he recognized Evan Phillips, one of the jurors. Huntsman talked to Lindeman after the trial

and informed him that Huntsman "knew positively that Evan Phillips knew Scott Weeks," an individual listed on the witness list. Huntsman alleged that he, Phillips, and Weeks were involved in the same alcohol recovery programs. In his affidavit in support of this claim, Lindeman stated he "would certainly not have accepted [Phillips] as a juror if [he] had known [Phillips] was acquainted with some of the people [he] was accusing."

 Generally, a "verdict should stand unless the evidence clearly establishes a serious violation of the juror's duty and deprives a party of a fair trial." [33] A party may show a serious violation of a juror's duty by establishing serious misconduct such as fraud, bribery, or forcible coercion.[34] A party may show that such a violation deprives them of a fair trial by addressing three factors: (1) whether the juror would have been challenged for cause had the juror disclosed the relevant information; (2) whether the misconduct went to a collateral or material issue; and (3) whether the probable effect of the misconduct was prejudicial.[35]

Judge McKay found that none of the three prejudice factors were present: the trial attorney did not state in his affidavit that he would have challenged Phillips had he known that he was acquainted with Weeks; there was no evidence that Phillips made any improper comments on any material issue; and there was no evidence that Lindeman was denied a fair trial.

We agree with Judge McKay's conclusions. In particular, we note that Lindeman's allegations indicated that the references to Weeks during Lindeman's trial were insignificant. Although Weeks was on the prosecution's witness list, he never testified at the trial. The only references to Weeks were in Lindeman's interviews with the police. Lindeman alleged that in his first interview,

**33.** *West v. State*, 409 P.2d 847, 852 (Alaska 1966); see also *Swain v. State*, 817 P.2d 927, 930–31 (Alaska App.1991); *Fickes v. Petrolane–Alaska Gas Serv., Inc.*, 628 P.2d 908, 910 (Alaska 1981).

**34.** *Swain*, 817 P.2d at 930 (quoting *Fickes*, 628 P.2d at 910).

**35.** *Id.* at 931.

he identified Weeks as a "skinhead" who knew some of Rossman's "skinhead" assailants. Lindeman also alleged that he stated that Weeks might know where Rossman's assailants lived. Even if Lindeman had established that juror Phillips knew Weeks, these references were insufficient to suggest that Lindeman suffered any prejudice at his trial.

### Medical expert

█ Lindeman argues that his trial attorney was ineffective for failing to obtain additional expert services. He argues that because the medical issues in his case were complex, trial counsel should have called a neuropathologist to counter the State's experts. Lindeman claims that although Rossman's cause of death (cerebral edema) was consistent with either his extreme intoxication or a traumatic injury, further technical analysis by a neuropathologist could have ruled out trauma as the cause of death. Lindeman's claim is based on a post-trial report he obtained from a neuropathologist, Dr. Jan Leestma.

We reject this claim for several reasons. First, the trial court never addressed this issue in its decision, and it is unclear if the court was aware that Lindeman was alleging this claim in his petition. The first time the issue appeared was in Lindeman's response to the State's motion to dismiss his petition for post-conviction relief.

Second, a petitioner must submit an affidavit from counsel addressing claims of ineffectiveness.[36] Here, Lindeman has submitted two affidavits from his trial attorney, but neither mentions additional experts or the neuropathologist's report.

Third, there is no evidence that the trial attorney's choice in experts was not a tactical decision.[37] This is largely because the attor-

ney's affidavits do not address his choice of experts. The trial attorney retained a forensic pathologist, Dr. Janice Ophoven, who examined the medical evidence and testified at trial. It is not clear why the trial attorney chose one expert over another. Even assuming the claim was properly raised, Lindeman presented insufficient evidence to establish a prima facie case of ineffectiveness.

█ Lindeman also argues that he is entitled to a new trial under Criminal Rule 35.1 based on Dr. Leestma's report. Dr. Leestma's report contradicted the State's witness and indicated that Rossman had sustained numerous injuries many hours before his death, which arguably supports Lindeman's claim that he and Rossman were attacked outside of the apartment. The report was composed from Dr. Leestma's review of the autopsy report, records from the medical examiner's office, transcripts of the medical examiner's testimony at grand jury and trial, transcripts of Dr. Ophoven's testimony, transcripts of Lindeman's statements, photographs of the death scene and of Rossman's body, and Anchorage police documents and reports.

Again, this report is not "new evidence" because it is based on evidence available at trial.[38] Lindeman does not argue that Dr. Leestma's report used any models, techniques, or methodology not available at the time of trial. Dr. Leestma's report was composed from trial evidence and testimony. Lindeman is not entitled to a new trial because the evidence is not "new evidence" that would entitle Lindeman to post-conviction relief.

### Sentencing issues

█ Next, Lindeman argues that his trial attorney was ineffective in the way he addressed certain sentencing issues. He ar-

---

**36.** *Allen v. State,* 153 P.3d 1019, 1021–22 (Alaska App.2007).

**37.** *See State v. Steffensen,* 902 P.2d 340, 341 (Alaska App.1995) (explaining that to show ineffective assistance, a defendant must show that

there was no valid tactical reason underlying the attorney's decision).

**38.** *Osborne II,* 163 P.3d at 984.

gues that his trial attorney failed to object to the sentence as an unwarranted departure from the *Page* benchmark.[39] He also argues that his trial attorney was ineffective for conceding certain facts and not objecting to the sentencing court's findings under *Apprendi* and *Blakely*.[40]

The trial court did not rule on this issue. Lindeman initially argued that his sentence violated *Apprendi* and *Blakely*, but the first time he presented any substantive argument that his trial attorney was ineffective at sentencing was in his response to the State's motion to dismiss. His trial attorney did not address this claim in either of his two affidavits.

Absent a statement from the trial attorney to the contrary, his general arguments at sentencing appear to be the result of a tactical choice.[41] Although the trial attorney conceded that Lindeman had a role in Rossman's death, he argued that Lindeman was too drunk to form the intent to kill, that the evidence suggested mutual combat, and that Lindeman had shown great remorse. It seems likely that the trial attorney considered these arguments to be tactically superior to an argument that would run contrary to the jury's verdict.

In particular, Lindeman's claim about the application of *Apprendi* and *Blakely* are without merit. Lindeman was convicted of second-degree murder, a charge that carries a sentencing range of up to ninety-nine years.[42] The sentencing judge was not required to find any aggravating factors to impose a maximum sentence for this crime. Therefore, Lindeman's sentencing hearing was not subject to the *Apprendi* and *Blakely* requirement of a jury trial for aggravating factors that may increase the sentence beyond the punishment authorized by the jury's verdict.[43]

### Conclusion

We AFFIRM the superior court's judgment. Lindeman is entitled to file an appeal on the issue of whether the supplemental jury instruction allowed the jury to convict Lindeman on a theory not encompassed by the indictment. The opening appellate pleadings must be filed within 30 days, but the filing fee is waived.

---

**39.** *See Page v. State*, 657 P.2d 850, 854–55 (Alaska App.1983) (establishing a benchmark range of 20 to 30 years for a "typical" second-degree murder).

**40.** *See Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (requiring that facts that increase the penalty for a crime beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be found by a jury beyond a reasonable doubt); *Blakely v. Washington*, 542 U.S. 296, 301, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) (applying *Apprendi* to presumptive sentencing).

**41.** *See Jones*, 759 P.2d at 569 ("In the absence of evidence ruling out the possibility of a tactical reason to explain counsel's conduct, the presumption of competence remains unrebutted and operates to preclude a finding of ineffective assistance."); *Steffensen*, 902 P.2d at 341.

**42.** Former AS 11.41.110(b) (1996); former AS 12.55.125(b) (1996).

**43.** *Carlson v. State*, 128 P.3d 197, 211 (Alaska App.2006) (concluding that a defendant convicted of second-degree murder has no right to a jury trial on the question of whether they should receive a sentence above the *Page* benchmark range).