# United States Court of Appeals
## For the First Circuit

No. 09-1894

SCOTT TEVLIN,

Petitioner, Appellant,

v.

LUIS SPENCER, Superintendent,
Massachusetts Correctional Institution - Norfolk,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Thompson, Selya, and Dyk,* Circuit Judges.

Victoria L. Nadel for appellant.
James J. Arquin, Assistant Attorney General, Criminal Bureau,
with whom Martha Coakley, Attorney General, was on brief for
appellee.

October 8, 2010

---

\* Of the Federal Circuit, sitting by designation.

**DYK, <u>Circuit Judge</u>.** In 1997, Scott Tevlin ("Tevlin") was convicted in a Massachusetts state court of murder in the first-degree (felony murder), armed robbery, and assault and battery by means of a dangerous weapon. He was sentenced to life imprisonment without the possibility of parole for the felony murder and a concurrent term of nine to ten years for the assault and battery. His convictions were affirmed on direct appeal, and postconviction relief was also denied by the Massachusetts state courts. In 2006, Tevlin petitioned for a writ of habeas corpus in the United States District Court for the District of Massachusetts pursuant to 28 U.S.C. § 2254. The court denied the petition on June 10, 2009. On appeal Tevlin argues, first, that he received ineffective assistance of counsel due to trial counsel's failure to challenge or investigate certain evidence, and second, that he was denied due process by the Commonwealth's refusal to grant him postconviction access to fingerprint evidence. We hold that Tevlin has failed to establish any constitutional violation, and we therefore affirm the denial of habeas corpus relief.

**I.**

In habeas cases, we presume that factual determinations by state courts are correct. 28 U.S.C. § 2254(e)(1); <u>Teti</u> v. <u>Bender</u>, 507 F.3d 50, 58-59 (1st Cir. 2007). In any event, the facts as presented at trial and as set forth by the Supreme Judicial Court of Massachusetts are not herein contested. <u>See</u>

Commonwealth v. Tevlin, 741 N.E.2d 827, 830-32 (Mass. 2001). In light of Tevlin's convictions, those decisions correctly recited the version of the facts at trial most favorable to the Commonwealth. Tevlin, 741 N.E.2d at 830. Thus, we describe the facts of this case as they appear in the decisions of the Massachusetts courts. See Teti, 507 F.3d at 53.

On the morning of March 2, 1996, just before 7:30 a.m., the evidence showed that Tevlin assaulted seventy-four-year-old Angela Lyons ("Lyons") while attempting to steal her purse in a Shaw's supermarket parking lot in Brockton, Massachusetts. Lyons resisted, and Tevlin responded by knocking her down and dragging her across the pavement. He then stomped on her stomach. Upon wrestling the purse free, Tevlin fled the scene in a white car.

Cecelia Peterson ("Peterson") was an eyewitness to the attack and assisted Lyons immediately afterward. Lyons told Peterson that the assailant had stomped on her stomach; that she was upset and in pain; and that she was losing sensation in her legs.

Officer Steven Williamson ("Officer Williamson") of the Brockton police department responded to the scene. Lyons told him that a young, white male had attacked her. Peterson described the assailant as approximately twenty-five years old, five feet ten inches tall, and 150 pounds, with black hair, a mustache, and a goatee. Peterson also told Officer Williamson that the assailant

escaped in a white car with the license plate number "ZPF 214." Another witness also described the assailant leaving in a white car with a license plate number beginning with "214."

At the hospital, Lyons explained to Dr. John Steinmetz ("Dr. Steinmetz") that a young man had tried to steal her purse and stomped twice on her stomach. An examination revealed that Lyons' aorta had been crushed just above her navel, and due to calcification of cholesterol plaque in the vessel, her aorta remained crushed, impairing blood flow to her spinal cord and lower extremities. Her condition deteriorated, and despite surgery to repair the damaged aorta, Lyons died on March 5, 1996. The cause of death was complications due to blunt abdominal trauma.

In the days following the attack, Peterson worked with State Trooper Scott Berna ("Trooper Berna") to prepare composite sketches of the assailant. Peterson also reviewed photographs of possible suspects. None of the photographs was of Tevlin. Then on March 6, 1996, police found a white Pontiac Bonneville parked outside an apartment complex in Brockton. The car, with license plate number "214 ZPV," had been stolen from the owner's home a few days earlier, sometime on the evening of March 1 or in the early morning of March 2. It was later identified by Peterson as the car in which she saw the assailant escape. A fingerprint analysis was conducted, and a fingerprint on the wiper control lever was found to match Tevlin's thumbprint.

On March 10, 1996, Trooper Berna showed Peterson a series of eighteen photographs, one of which was a three-year-old photograph of Tevlin, but Peterson could not make an identification. The following day, Tevlin was arrested, and Peterson reviewed eight more photographs, including one of Tevlin taken that morning. Peterson still failed to make a positive identification.

On March 12, 1996, Peterson saw Tevlin's picture in the newspaper. He was identified as the man arrested for the attack on Lyons. Peterson telephoned Trooper Berna to express her concern that the police may have arrested the wrong person, because she did not recognize Tevlin as the assailant. On March 13, Peterson met with Trooper Berna and asked if there were any more pictures of Tevlin she could review. Trooper Berna provided her with about a dozen photographs of Tevlin. She did not make, nor was she asked to make, an identification at that time. Instead, Peterson and Trooper Berna discussed the case, and Trooper Berna told Peterson that Tevlin's fingerprint had been found in the Pontiac. On March 15, 1996, Peterson called Trooper Berna and told him that she was now confident that Tevlin was in fact the assailant. She explained that previously she had been focused on the assailant's grin on the morning of the attack, and that once she removed that grin from her mind, she realized that the police had the right man. At trial, she identified Tevlin as the man who attacked Lyons.

At the time of the attack, Tevlin lived within a five-minute walk from where the Pontiac Bonneville had been stolen. On the morning of the attack, at about 6:00 a.m., Tevlin stopped at the Brockton home of his "surrogate" stepfather. Tevlin stayed for about forty-five minutes and smoked a piece of crack cocaine before leaving with the stated intention of getting more crack. The attack on Lyons occurred shortly before 7:30 a.m. Tevlin returned at about 8:00 a.m., where he told Dorothea Hustus ("Hustus"), who also lived at the apartment, that he and a friend had been involved in robberies at Shaw's supermarkets in the nearby towns of Easton and Abington. (He did not mention an attack in Brockton.) He also told Hustus that he had stolen a car. Hustus noted that Tevlin appeared very nervous and repeatedly looked out of the windows. When she told Tevlin to leave, he asked her to check outside for police. Hustus then observed Tevlin walk to a white car parked on the street, pace back and forth for about twenty minutes, and finally get in and drive off. Twenty minutes later, however, Tevlin was back at the apartment with the white car. He told Hustus that he had gotten into an accident and that he needed a place to stay because the police might be looking for him. Tevlin left for the final time at about 10:00 a.m. The following week, Hustus went to the Brockton police station and identified the Pontiac Bonneville as the car Tevlin had driven to her house on the morning of the attack on Lyons, March 2, 1996.

Tevlin was arrested on March 11, 1996. On the date of his arrest, which was nine days after the attack, Tevlin was five feet eleven inches tall, weighed 170 pounds, and had dark hair, a mustache, and a goatee. He thus matched Peterson's initial description with only minor variations. After his arrest, while incarcerated at the Plymouth County house of correction, Tevlin admitted his involvement in the robbery and attack in question to another inmate. This inmate later testified at the trial as to Tevlin's admission.

On March 25, 1996, Tevlin was indicted on four counts: (1) murder in the first degree, in violation of Mass. Gen. Laws ch. 265, § 1; (2) armed robbery, in violation of Mass. Gen. Laws ch. 265, § 17; (3) unarmed robbery on a victim sixty years of age or older, in violation of Mass. Gen. Laws ch. 265, § 19(a); and (4) assault and battery by means of a dangerous weapon on a victim sixty years of age or older, in violation of Mass. Gen. Laws ch. 265, § 15A(a).

On April 15, 1997, on the eve of trial, Tevlin's counsel filed a motion to suppress Peterson's identification, but the motion was withdrawn following a voir dire examination of Peterson. Tevlin's counsel explained to the trial judge that he had discussed the motion with Tevlin and concluded as a matter of judgment not to pursue it. Tevlin's jury trial began on April 17, 1997, and on May 1, 1997, the jury found him guilty of first-degree murder based on

a felony murder theory (with armed robbery as the predicate felony), armed robbery, and assault and battery by means of a dangerous weapon. The Massachusetts Superior Court sentenced Tevlin to life imprisonment without the possibility of parole for the murder, and nine to ten years on the assault and battery conviction, to be served concurrently.

Tevlin appealed his conviction to the Supreme Judicial Court of Massachusetts. Among his arguments on direct appeal was that trial counsel was ineffective for failing to pursue the motion to suppress Peterson's identification. The Supreme Judicial Court rejected Tevlin's claims and affirmed his convictions on January 30, 2001. See Tevlin, 741 N.E.2d at 827.

On March 1, 2002, Tevlin filed a motion for new trial with the Superior Court. His arguments in support included two more ineffective assistance claims relevant to the present appeal: failure to adequately investigate alternative medical theories for Lyons' cause of death, and failure to adequately challenge the fingerprint evidence on cross-examination of the Commonwealth's fingerprint expert. Tevlin also filed a motion for postconviction access to fingerprint evidence for additional testing. On October 21, 2004, the trial court denied Tevlin's motion for postconviction discovery of fingerprint evidence not presented at trial, holding that Tevlin had not established a prima facie case for postconviction relief as required by Massachusetts law. On June

22, 2005, the court denied Tevlin's motion for a new trial, rejecting the ineffective assistance arguments. A single justice of the Supreme Judicial Court denied Tevlin's petition to appeal the denial of his motion for a new trial, under the gatekeeper provision of Mass. Gen. Laws ch. 278, § 33E, on February 28, 2006.

Failing to obtain relief in the Massachusetts courts, Tevlin filed a petition for writ of habeas corpus on May 8, 2006, in the District of Massachusetts, pursuant to 28 U.S.C. § 2254, asserting four separate grounds for relief, only two of which are raised on appeal here: ineffective assistance of counsel, and denial of due process in failing to grant access to postconviction discovery.

On June 10, 2009, without holding an evidentiary hearing, the district court denied the petition. As to the ineffective assistance of counsel claims, the court held that it could not "second-guess the conclusions of the courts of the Commonwealth as to the tactical choices made by trial counsel" and that it was "satisfied on a review of the entire record that the conclusion that they were tactical choices is an appropriate conclusion on this record given the strength of the evidence against Mr. Tevlin." As to the Commonwealth's denial of access to fingerprint evidence, the district court stated that "because the Supreme Court has never yet authorized access to fingerprint evidence on a showing like

that here," the district court could not authorize it in Tevlin's case.

Tevlin timely appealed, and the district court granted a certificate of appealability. We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.

**II.**

We review the district court's denial of habeas relief de novo. <u>Aspen</u> v. <u>Bissonnette</u>, 480 F.3d 571, 573 (1st Cir. 2007). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), "the level of deference owed to a state court decision [on federal habeas review] hinges on whether the state court ever adjudicated the relevant claim on the merits or not." <u>Clements</u> v. <u>Clarke</u>, 592 F.3d 45, 52 (1st Cir. 2010) (citing 28 U.S.C. § 2254(d)). If a state court has adjudicated a claim on the merits, a federal habeas court must defer to the state court proceedings unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The AEDPA standard applies, and it is difficult to meet. This is particularly so where, as here, Tevlin argues that there has been a departure from a very general standard such as that set forth in <u>Strickland</u> v. <u>Washington</u>, 466 U.S. 668

-10-

(1984). However, we need not dwell on whether there was here a decision by the Massachusetts courts that was contrary to or an unreasonable application of clearly established Federal law, for we conclude that there was in fact no constitutional violation. Without a constitutional violation, of course, Tevlin cannot meet the AEDPA standard.

In the present appeal, Tevlin argues that he received ineffective assistance of trial counsel under three theories: (1) failure to pursue the motion to suppress Peterson's identification, (2) failure to adequately investigate alternative medical theories regarding Lyons' cause of death, and (3) failure to adequately challenge the fingerprint evidence. As to the first ineffective assistance theory, the Massachusetts Supreme Judicial Court considered Tevlin's argument on its merits and rejected it. As to Tevlin's other two ineffective assistance theories, the Superior Court also adjudicated these claims on their merits.

To succeed on a claim of ineffective assistance of counsel, Tevlin must show both deficient performance by counsel and resulting prejudice. Strickland, 466 U.S. at 687. In order to satisfy the "deficient performance" prong, Tevlin must show that his trial counsel's representation "fell below an objective standard of reasonableness." Id. at 688. Review of counsel's performance must be deferential, and reasonableness must be considered in light of "prevailing professional norms." Id. at

-11-

688-89. There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and Tevlin "must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). Thus, this court has held that a lawyer's performance is deficient under Strickland "only where, given the facts known at the time, counsel's choice was so patently unreasonable that no competent attorney would have made it." Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006) (internal citation and quotation marks omitted).

In order to satisfy the "prejudice" prong, Tevlin must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Porter v. McCollum, 130 S. Ct. 447, 453 (2009) (per curiam) (quoting Strickland, 466 U.S. at 694) (quotation marks omitted). Although he need not show "that counsel's deficient conduct more likely than not altered the outcome" of his proceeding, he must establish "a probability sufficient to undermine confidence in [that] outcome." Id. at 455-56 (quoting Strickland, 466 U.S. at 693-94) (quotation marks omitted). A defendant's failure to satisfy one prong of the Strickland analysis obviates the need for a court to consider the remaining prong. See Strickland, 466 U.S. at 697.

Tevlin first argues that his trial counsel was ineffective for failing to pursue the motion to suppress Peterson's identification, because of the unduly suggestive manner in which the identification was procured. He contends that Trooper Berna tainted the identification by showing Peterson numerous photographs of Tevlin and telling her that Tevlin's fingerprints had been found in the white Pontiac Bonneville. In cases in which a witness was subjected to a pretrial confrontation "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law," the defendant may seek to exclude the identification evidence from trial. Stovall v. Denno, 388 U.S. 293, 301-02 (1967); see Manson v. Brathwaite, 432 U.S. 98, 109-14 (1977); Neil v. Biggers, 409 U.S. 188, 196-201 (1972); Commonwealth v. Venios, 389 N.E.2d 395, 397 (Mass. 1979).

Tevlin contends that Trooper Berna's actions were so suggestive that any competent counsel would have sought to suppress Peterson's identification of Tevlin. The Massachusetts Supreme Judicial Court, however, held that "there was a sound tactical basis for the decision" not to seek to suppress the identification. Tevlin, 741 N.E.2d at 837. The court noted that "[t]he evidence against the defendant, even without Peterson's identification, was extremely strong," and as such the suppression of that identification "would not seriously have weakened the Commonwealth's case." Id. But "[p]ermitting the identification

-13-

testimony and then attacking the strength and circumstances of the identification provided the defense with a basis on which to attack the police procedure." Id. The defense would then have the opportunity to "impeach Peterson's identification in an effort to develop enough question on that issue that might create a reasonable doubt about the entire case." Id. at 838. Tevlin's counsel did just that at trial: he "argued that his arrest and prosecution were the result of a police rush to judgment in a highly publicized murder case in which the police were under pressure to make an arrest. Peterson's identification, and the police conduct that led to that identification, were used to illustrate that rush to judgment." Id. at 837-38. Under the circumstances, we agree with the Supreme Judicial Court that the choice not to seek the suppression of Peterson's identification — a choice that Tevlin and his trial counsel considered for a "few months," id. at 837 — represented a legitimate strategic decision. As such, Tevlin's trial counsel's performance on this matter was not deficient.

Tevlin next argues that his trial counsel was ineffective for failing to investigate alternative medical theories regarding Lyons' cause of death. He asserts that his trial counsel should have hired a medical expert to show that Lyons' death may have been

caused by something other than Tevlin's stomping on her stomach.[1]

In support of his new trial motion, Tevlin provided an affidavit from Dr. Ira Kanfer, a pathology expert contacted by his post conviction counsel, that questioned whether Lyons had been stomped on and suggests the possibility that Lyons could have been injured by a fall to the ground. Tevlin alternatively suggests that the injury might have been caused by the assailant's dragging Lyons across the ground rather than stomping (which in Tevlin's view might support a finding of not guilty of felony murder).[2] The Superior Court rejected this ineffective assistance theory. It noted that Tevlin's trial counsel did in fact consult a forensic expert, and that "[a]fter discussing the medical evidence" with the expert, counsel stated that he "decided not to contest the cause of death at trial but to concentrate on the identification of the perpetrator." The court concluded that it was a "reasonable decision" by Tevlin's counsel "not to focus on the cause of the victim's death and focus on more substantial grounds of defense."

---

[1] Tevlin argues that a nurse's assessment taken when Lyons was admitted to the hospital does not show bruising around Lyons' abdomen, but the autopsy report noted substantial bruising in that area.

[2] If Tevlin was unarmed, the Commonwealth was required to show that Tevlin committed the unarmed robbery with "conscious disregard for human life" in order to obtain a felony murder conviction. Tevlin, 741 N.E.2d at 835 n.5. Tevlin theorizes that dragging was not as malicious as stomping. On the other hand, the theory that Tevlin committed an armed robbery depended on his use of his sneakers to stomp the victim.

-15-

In addition, the court found that there was little to be gained by pursuing an alternative medical theory. In the court's view, this was so, first, because there was testimony that Lyons had told at least three separate people that she had been stomped, and second, because even if Lyons' death was caused by a fall to the ground instead of a stomp, such a fall could still be attributed to Tevlin when he was fighting Lyons for her purse. We agree with at least the first point. Trial counsel could reasonably have concluded that nothing was to be gained by attempting to argue based on medical evidence that the stomping had not occurred and that some other action could have been the cause of death. This certainly can be considered sound trial strategy based on the additional evidence regarding the existence of a stomp, specifically Lyons' three separate statements that she was stomped on by the assailant. Counsel could have reasonably concluded that disputing whether a stomping had occurred in the face of such overwhelming evidence might harm Tevlin's case. As the district court correctly rejected Tevlin's argument that his counsel should have contested whether a stomp had occurred, we need not decide whether, assuming there had been no stomping, Lyons' fall could have caused her death, or whether the fall should be attributed to Tevlin. Under the circumstances, Tevlin's trial counsel's performance was not deficient in choosing not to focus on the cause of Lyons' death.

Tevlin's third theory for his claim of ineffective assistance of counsel is that his trial counsel failed to adequately cross-examine the Commonwealth's fingerprint witnesses. At trial, State Trooper Ed O'Neill ("Trooper O'Neill") testified that he removed a latent fingerprint from the wiper control knob on the driver's side of the white Pontiac Bonneville through a process known as "Super Glue fuming," in which Super Glue was placed on a heating plate inside the car to allow the glue vapors to adhere to any latent prints. Tevlin's trial counsel did not cross-examine Trooper O'Neill. Lieutenant Richard Lauria ("Lieutenant Lauria") then testified that the print from the wiper control knob matched Tevlin's. He also testified that the fingerprint was a "weak print" and that the police "got [the print] in really good shape after working quite a bit of time on it." On cross-examination of Lauria, Tevlin's trial counsel merely pointed out a labeling mistake on one of the exhibits and did not question any of the procedures or the conclusions reached by Lieutenant Lauria.

Tevlin argues that counsel should have cross-examined Lieutenant Lauria with respect to Lauria's supposed admission that he had altered the fingerprint found in the car. The Superior Court explicitly rejected Tevlin's argument that Lieutenant Lauria's testimony suggested that there was something untoward in the police's handling of the fingerprint. Rather, the court found that it was "immediately apparent" that the testimony merely

-17-

related to how the police had used the Super Glue fuming technique to reveal the latent fingerprint. Tevlin further asserts that any reasonable counsel would have challenged this evidence because Peterson testified that she observed the assailant enter the passenger side of the getaway car, not the driver's side where the fingerprint was found. This point overlooks the evidence from Hustus that Tevlin drove the car at other times.

While Tevlin's trial counsel failed to cross-examine Trooper O'Neill and only briefly cross-examined Lieutenant Lauria, Tevlin has not shown a reasonable probability that more vigorous examination would have undermined the fingerprint evidence. As this court has observed, "[e]xperienced trial attorneys may choose not to cross examine witnesses where the probable result is a mere repetition and strengthening of the direct testimony. Counsel here could have reasonably concluded that cross examination would at best be futile and at worst self-destructive." United States v. Moreno Morales, 815 F.2d 725, 751 (1st Cir. 1987).

We conclude that Tevlin has therefore failed to demonstrate the existence of ineffective assistance of counsel in any of his three theories. Unlike the case of Wilson v. Mazzuca, 570 F.3d 490 (2d Cir. 2009), relied on by Tevlin, this is not a situation in which trial counsel made "incomprehensible" choices, "misinterpreted and misunderstood the law, failed to pay attention,

-18-

acted recklessly, and did not appreciate the consequences of his decisions." Id. at 505-06.

**III.**

Tevlin appears to claim that the Commonwealth of Massachusetts committed a pretrial Brady violation by withholding the original fingerprint evidence. Brady v. Maryland, 373 U.S. 83 (1963). The original fingerprint was available during pretrial discovery, but Tevlin's trial counsel chose not to request it. However, this argument was waived. Tevlin did not raise this issue with the Commonwealth courts or the district court. Instead, he confined his Brady argument to his postconviction right to gain access to the evidence, not his pretrial right to the evidence.

Tevlin did argue both in the Massachusetts courts and the district court that he was denied due process by the Commonwealth's failure to grant him postconviction access to the fingerprint evidence — namely, the original latent fingerprint pulled from the wiper control knob of the white Pontiac Bonneville. Only enhanced images of the latent fingerprint were entered into evidence during Tevlin's criminal trial, not the original. As noted above, Tevlin contends that the police somehow altered the fingerprint, based on Lieutenant Lauria's testimony that the police "got [the print] in really good shape after working quite a bit of time on it." Tevlin seeks the original latent fingerprint so that additional analysis can be performed and possibly reveal how the police altered the

print. The Superior Court denied Tevlin's motion for postconviction discovery of the original fingerprint, holding that he failed to meet his burden of establishing a prima facie case for postconviction relief as required by Massachusetts law. A justice of the Massachusetts Supreme Judicial Court rejected Tevlin's due process arguments in denying his petition to appeal the denial of his motion for a new trial.

Tevlin argues that because the fingerprint evidence may be exculpatory or impeaching, he has a postconviction due process right to the evidence under the Supreme Court's decision in Brady v. Maryland, 373 U.S. at 83. Brady held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. The Court later held that the duty to disclose such evidence is applicable even though there has been no request by the accused, United States v. Agurs, 427 U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, United States v. Bagley, 473 U.S. 667, 676 (1985).

However, the Supreme Court has explicitly rejected Brady's applicability to postconviction proceedings. In District Attorney's Office for the Third Judicial Dist. v. Osborne, 129 S. Ct. 2308 (2009), the Court noted that "[a] criminal defendant

-20-

proved guilty after a fair trial does not have the same liberty interests as a free man." Id. at 2320. The Court went on to explain:

> The State accordingly has more flexibility in deciding what procedures are needed in the context of postconviction relief. "[W]hen a State chooses to offer help to those seeking relief from convictions," due process does not "dictat[e] the exact form such assistance must assume." Pennsylvania v. Finley, 481 U.S. 551, 559 (1987). [A defendant's] right to due process is not parallel to a trial right, but rather must be analyzed in light of the fact that he has already been found guilty at a fair trial, and has only a limited interest in postconviction relief. Brady is the wrong framework.
>
> Instead, the question is whether consideration of [the defendant's] claim within the framework of the State's procedures for postconviction relief "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," or "transgresses any recognized principle of fundamental fairness in operation." Medina v. California, 505 U.S. 437, 446, 448 (1992) (internal quotation marks omitted) . . . . Federal courts may upset a State's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided.

Osborne, 129 S. Ct. at 2320 (citations omitted). It is Tevlin's "burden to demonstrate the inadequacy of the state-law procedures available to him in state postconviction relief." Id. at 2321.[3]

Brady is thus the "wrong framework" for analyzing Tevlin's due process claim relating to postconviction discovery.

---

[3] The district court did not have the benefit of the Supreme Court's ruling in Osborne when it denied Tevlin's petition, as the district court made its ruling one week before Osborne was decided.

-21-

Rather, the question is whether Massachusetts postconviction discovery procedures are "fundamentally inadequate to vindicate the substantive rights provided." Id. at 2320. We hold that they are not.

Massachusetts Rule of Criminal Procedure 30 defines the Commonwealth's postconviction procedures. It provides that judges have discretion to authorize postconviction discovery "[w]here affidavits filed by the moving party . . . establish a prima facie case for relief." Mass. R. Crim. P. 30(c)(4). "In requesting such discovery, the defendant must make a sufficient showing that the discovery is reasonably likely to uncover evidence that might warrant granting a new trial." Commonwealth v. Daniels, 837 N.E.2d 683, 696 (Mass. 2005).

> To meet the prima facie case standard for discovery under a motion for a new trial based on newly discovered evidence, a defendant must make specific, not speculative or conclusory, allegations that the newly discovered evidence would have "materially aid[ed] the defense against the pending charges," Commonwealth v. Tucceri, 412 Mass. 401, 405, 589 N.E.2d 1216 (1992), and that this evidence, if explored further through discovery, could yield evidence that might have "played an important role in the jury's deliberations and conclusions, even though it is not certain that the evidence would have produced a verdict of not guilty." Id. at 414, 589 N.E.2d 1216.

Daniels, 837 N.E.2d at 696. Here, Tevlin did not even attempt to satisfy this standard. In his motion for postconviction discovery in the Massachusetts Superior Court, Tevlin included just a single affidavit from his postconviction counsel. The affidavit sought access to the fingerprint evidence "in light of the significant

-22-

recent cases regarding fingerprint evidence which indicate that fingerprints may be exculpatory even when the government has asserted that they belonged to the defendant." But beyond this, the affidavit failed to set forth any facts as to how the fingerprint evidence in this case would have "materially aid[ed] the defense." Id.

Tevlin argues that the affidavit requirement violates due process because the Massachusetts procedures present a Catch-22 situation. He cannot know what the original fingerprint evidence will reveal until he is able to examine the evidence. This narrow view of the postconviction discovery procedures is inaccurate. While a postconviction claim for relief must be supported by affidavits, see Mass. R. Crim. P. 30(c)(3), (4), these affidavits need not directly address the content of the withheld material. Here, for example, Tevlin could have provided an affidavit stating that he was never in the white Pontiac Bonneville and that the fingerprint found on the wiper control knob could not have been his print. Or he could have provided an affidavit from a fingerprint expert stating that he reviewed the trial evidence and concluded that the methodology employed by the Commonwealth was flawed, such that the enlarged fingerprint evidence was unreliable and that further testing would be likely to produce evidence favorable to the defendant. Such affidavits could then support his allegations that the original fingerprint evidence would have materially aided

his defense. See Daniels, 837 N.E.2d at 696. In this case, Tevlin simply made no effort to satisfy the Massachusetts requirements.

The Massachusetts procedure is no more restrictive, and in fact appears to be more permissive, than the Alaska postconviction discovery procedures authorized by the Supreme Court in Osborne. The postconviction discovery procedure for DNA evidence in Alaska considered by the Court in Osborne required a defendant seeking postconviction DNA testing to show "(1) that the conviction rested primarily on eyewitness identification evidence, (2) that there was a demonstrable doubt concerning the defendant's identification as the perpetrator, and (3) that scientific testing would likely be conclusive on this issue." Osborne, 129 S. Ct. at 2318. While Alaska required a showing that scientific testing of DNA evidence would likely be conclusive of a defendant's innocence, Massachusetts merely requires a prima facie case for relief. The Massachusetts procedure permits postconviction discovery "even though it is not certain that the evidence would have produced a verdict of not guilty." Tucceri, 589 N.E.2d at 1224.

Tevlin has thus failed to demonstrate how the Massachusetts postconviction discovery procedures are "fundamentally inadequate to vindicate the substantive rights provided." Osborne, 129 S. Ct. at 2320. We hold that the Massachusetts procedures are not on their face unconstitutional,

and that Tevlin has not established that their application here violated due process.[4]

## IV.

For these reasons, we affirm the denial of habeas corpus relief by the district court.

**AFFIRMED**.

---

[4]    At oral argument, Tevlin's counsel seemed to suggest that the Massachusetts courts erred in applying the Massachusetts standard. We note that "[f]ederal habeas relief cannot be granted merely because a state court errs in its application of state law." Sanna v. Dipaolo, 265 F.3d 1, 11 (1st Cir. 2001); see also Puleio v. Vose, 830 F.2d 1197, 1204 (1st Cir. 1987) ("Habeas review does not ordinarily extend to state court rulings on the admissibility of evidence.").